**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

LISA ANN ARTHUR,

      Plaintiff,

v.                                                       CIVIL ACTION NO. 2:20-cv-00532

ANDREW SAUL,
Commissioner of Social Security,

      Defendant.

**PROPOSED FINDINGS & RECOMMENDATION**

     Plaintiff Lisa Ann Arthur ("Claimant") seeks review of the final decision of the Commissioner of Social Security (the "Commissioner") denying her applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–33, and for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–83f. (ECF No. 2.) By standing order entered on January 4, 2016, and filed in this case on August 11, 2020, this matter was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 4.) Presently pending before this Court are Claimant's Memorandum in Support of Plaintiff's Motion for Judgement on the Pleadings (ECF No. 14) and the Commissioner's Brief in Support of Defendant's Decision (ECF No. 15).

     Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY**

Claimant's request to reverse the Commissioner's decision (ECF No. 14), **GRANT** the Commissioner's request to affirm his decision (ECF No. 15), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

## I.    BACKGROUND

### A. Information about Claimant and Procedural History of Claim

Claimant was 48 years old at the time of her alleged disability onset date and 51 years old on the date of the decision by the Administrative Law Judge ("ALJ").  (Tr. at 85.)[1]  She completed the eighth grade.  (*Id.* at 284.)  She has been employed as a home health aide and as a cashier and stocker in a restaurant and grocery store.  (*Id.*)  Claimant alleges that she became disabled on July 26, 2016, due to "back injury/pain," "carpal tunnel both arms/hands," and "possible blood disorder."  (*Id.* at 279, 283 (emphasis deleted).)

Claimant protectively filed her applications for benefits on August 21, 2017.  (*Id.* at 77, 262–69.)  Her claims were initially denied on April 10, 2018, and again upon reconsideration on May 29, 2018.  (*Id.* at 170–75, 182–95.)  Thereafter, on June 14, 2018, Claimant filed a written request for hearing.  (*Id.* at 198–212.)  An administrative hearing was held before an ALJ on June 11, 2019, in Logan, West Virginia, with the ALJ appearing from Charleston, West Virginia.  (*Id.* at 93–113.)  On June 27, 2019, the ALJ rendered an unfavorable decision.  (*Id.* at 74–92.)  Claimant then sought review of the ALJ's decision by the Appeals Council on August 22, 2019.  (*Id.* at 258–61.)  The Appeals Council denied Claimant's request for review on June 15, 2020, and the ALJ's decision became the final decision of the Commissioner on that date.  (*Id.* at 1–7.)

---

[1] All references to "Tr." refer to the Transcript of Proceedings filed in this action at ECF No. 13.

Claimant timely brought the present action on August 7, 2020, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).  (ECF No. 2.)  The Commissioner filed an Answer (ECF No. 12) and a transcript of the administrative proceedings (ECF No. 13).  Claimant subsequently filed her Memorandum in Support of Plaintiff's Motion for Judgement on the Pleadings (ECF No. 14), and in response, the Commissioner filed his Brief in Support of Defendant's Decision (ECF No. 15).  As such, this matter is fully briefed and ready for resolution.

### B. Relevant Medical Evidence

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and summarizes it here for the convenience of the United States District Judge.

#### 1. Treatment for Spinal Condition During Relevant Period

On January 5, 2017, about six months after her alleged onset date, Claimant presented to her primary care provider to request refills of her medications.  (Tr. at 642.)  Upon physical examination, the nurse practitioner observed tenderness on palpation and paraspinal muscle spasm in Claimant's lumbosacral spine.  (*Id.* at 643.)  She prescribed Claimant a muscle relaxer and ibuprofen.  (*Id.* at 644.)  Several weeks later, on January 17, 2017, Claimant presented to her pain management specialist for the first time in about six months and reported that her "pain has been slightly worse than previous" and was "Worst in middle of back and goes to right leg to top of the foot" and "Worse with movement." (*Id.* at 500.)  Upon physical examination, the pain management specialist observed tenderness and limited range of motion in her spine.  (*Id.* at 503.)  He recommended lumbar epidural steroid injections, which Claimant had on January 25 and February 1, 2017.  (*Id.* at 498–99, 503.)

At Claimant's next appointment with her pain management specialist on March 6, 2017, she reported that her injections were "80% effective" but "helped for about 2 weeks and have since worn." (*Id.* at 496.)  She rated her pain "3/10" that day. (*Id.*)  Upon physical examination, the pain management specialist observed tenderness and limited range of motion in Claimant's spine. (*Id.* at 496–97.)  He recommended a lumbar facet nerve block procedure, which Claimant underwent on March 7 and 20, 2017. (*Id.* at 490–95, 497.)  When Claimant returned to her primary care provider on March 31, 2017, the nurse practitioner again noted tenderness on palpation and paraspinal muscle spasm in Claimant's lumbosacral spine. (*Id.* at 652.)  She refilled Claimant's muscle relaxer and ibuprofen prescriptions. (*Id.* at 653.)  Claimant presented to her pain management specialist several days later, on April 3, 2017, for a follow-up after her nerve blocks. (*Id.* at 487.)  She reported that her injections "were 80% effective" and that "she still has some pain and soreness but most is gone."  She rated her pain "3/10 today" but "Denies changes in pain or new pain." (*Id.* at 487.)  A physical examination was normal. (*Id.* at 489.)

At Claimant's next appointment with her pain management specialist on June 5, 2017, she continued to complain of low back pain. (*Id.* at 485.)  Upon physical examination, he observed limited spinal range of motion, but he remarked that she was "resting comfortably," was "able to stand without delay," her stance was neutral, and her gait was unremarkable. (*Id.* at 485–86.)  He recommended a radiofrequency ablation procedure on Claimant's lumbar spine, with the right side before the left. (*Id.* at 486.)  Claimant had a lumbar rhizotomy on her right side on June 21, 2017, and on her left side on July 10, 2017. (*Id.* at 479–84.)  She returned to her pain management specialist on July 31, 2017, and stated that her "right side is still 'bothering me.'" (*Id.* at 453.)  She related that the procedures relieved her pain "80%" on the day of the procedures and the

day after but gave her only "40-50%" pain relief overall. (*Id.*) The pain management specialist observed improved range of motion in her spine upon physical examination. (*Id.* at 521.) In the meantime, on June 29, 2017, Claimant presented to her primary care provider, and the nurse practitioner again observed tenderness on palpation and paraspinal muscle spasm in Claimant's lumbosacral spine. (*Id.* at 655–56.) She refilled Claimant's prescriptions for a muscle relaxer and ibuprofen. (*Id.* at 656.)

On September 1, 2017, Claimant returned to her primary care provider, complaining of right flank and low back pain. (*Id.* at 677.) Upon physical examination, the physician's assistant observed tenderness on palpation and paraspinal muscle spasm in Claimant's lumbosacral spine. (*Id.* at 677.) He recommended steroid injections and an oral steroid, ordered imaging, and told Claimant to go to the emergency room "if the pain gets worse." (*Id.* at 678.) The next day, she presented to the emergency department at a local hospital, complaining of "acute" low back pain that had lasted for two days and did not radiate to her extremities. (*Id.* at 447.) Upon physical examination, the attending physician observed "moderate" pain in Claimant's "lumbar area and low back area" with painful range of motion "with all movement" but "normal spinal alignment." (*Id.* at 448.) She had normal sensation and reflexes and a "steady" gait. (*Id.*) Imaging of her lumbar spine revealed mild degenerative disc disease but no acute fracture. (*Id.* at 452.) Claimant was diagnosed with low back pain and discharged home in stable condition that same day with a prescription for a pain reliever. (*Id.* at 450.)

Later that month, on September 25, 2017, Claimant presented to her primary care provider for medication refills. (*Id.* at 679.) Upon physical examination, the nurse practitioner observed tenderness on palpation and paraspinal muscle spasm in Claimant's lumbosacral spine. (*Id.* at 679–80.) She refilled Claimant's muscle relaxer

and ibuprofen prescriptions.  (*Id*. at 680.)  Claimant again presented to her primary care provider about her medications on December 15, 2017.  (*Id*. at 688.)  Upon physical examination, the physician's assistant observed tenderness on palpation and paraspinal muscle spasm in Claimant's lumbosacral spine.  (*Id*. at 689.)  She refilled Claimant's prescriptions for the muscle relaxer and ibuprofen.  (*Id*. at 690.)

At Claimant's next appointment with her primary care provider on March 12, 2018, a physical examination was normal.  (*Id*. at 693–94.)  Claimant's prescriptions were again refilled.  (*Id*. at 694.)  One week later, on March 19, 2018, she presented to the emergency department at a local hospital, complaining of a "burning" low back pain that had lasted for about a week but had worsened over the preceding three days.  (*Id*. at 424.)  She explained that her pain was "different" from the pain for which she was treated by a pain management specialist.  (*Id*.)  Upon physical examination, the attending physician noted mild pain "of the lumbar area and right low back" but normal range of motion and no vertebral tenderness.  (*Id*. at 425.)  Imaging of Claimant's lumbar spine revealed "[m]ild degenerative changes and scoliosis" but no acute fracture.  (*Id*. at 429.)  She was diagnosed with low back pain and discharged home in stable condition that same day with a prescription for pain medication.  (*Id*. at 427.)  Also on March 19, 2018, Claimant presented to her primary care provider for prescription refills.  (*Id*. at 697.)  Upon physical examination, the physician's assistant observed decreased range of motion, tenderness on palpation, and paraspinal muscle spasm in Claimant's lumbosacral spine.  (*Id*. at 698.)  She ordered imaging of Claimant's lumbar spine and referred her for physical therapy.  (*Id*. at 698.)  The imaging was performed on March 23, 2018, and reflected "Degenerative changes without evidence for an acute process."  (*Id*. at 367.)  Claimant was prescribed an additional muscle relaxant on March 26, 2019.  (*Id*. at 977.)

Several days afterward, on April 2, 2018, Claimant presented to her pain management specialist for the first time in nearly a year and complained of low back pain that she rated "7/10." (*Id.* at 417–18.) A physical examination was unremarkable aside from limited range of motion in her spine. (*Id.* at 418.) At her next appointment with her pain management specialist on May 14, 2018, Claimant reported that she was still suffering from lower back pain and rated her pain "8/10." (*Id.* at 502, 516.) The pain management specialist observed limited range of motion in Claimant's spine upon physical examination. (*Id.* at 516.) He recommended physical therapy. (*Id.*)

Claimant's physical therapy began on May 22, 2018, and she told the physical therapist that her low back pain "had been progressively worsening with increase in intensity as well as 'burning' sensation." (*Id.* at 585.) She rated her pain a nine at worst and a five at best and stated that it was currently a seven. (*Id.*) She also stated that her pain worsened with bending, sitting, rising, standing, walking, and as the day progressed and "On the Move" and was better when lying down or still. (*Id.*) Upon physical examination, the physical therapist observed that Claimant walked with an antalgic gait and had decreased range of motion in her lumbar spine, decreased muscle strength, diminished reflexes, and pain and tenderness to palpation. (*Id.* at 586–88.) The physical therapist recommended two sessions per week for four weeks and stated that Claimant had good rehabilitation potential. (*Id.* at 588–89.) At her final session on June 6, 2018, Claimant told the physical therapist that she was "moving a little better but it stil [sic] hurts on the center of [her] back." (*Id.* at 570.) The physical therapist remarked that her pain "centraliz[ed] mostly on L4 and L5" and recommended further imaging "to determine if other options need to be considered." (*Id.* at 571.)

The following day, on June 7, 2018, Claimant presented to her primary care provider, and upon physical examination, the nurse practitioner observed that she was limping and had tenderness on palpation, decreased range of motion, and pain in her lumbar spine and a positive straight-leg raising test bilaterally. (*Id.* at 704.) She ordered imaging of Claimant's lumbosacral spine and refilled her prescriptions for her muscle relaxer and ibuprofen. (*Id.* at 705.) The imaging was performed on June 29, 2018, and revealed mild degenerative disc disease that was "unchanged from the prior study" dated January 28, 2016. (*Id.* at 713.)

Claimant returned to her primary care provider on August 27, 2018, for prescription refills. (*Id.* at 740.) A physical examination revealed a limping gait, tenderness on palpation, decreased range of motion, and pain in her lumbar spine and a positive straight-leg raising test bilaterally. (*Id.* at 741.) The physician's assistant renewed Claimant's prescriptions for her muscle relaxer and ibuprofen. (*Id.* at 742.)

On October 11, 2018, Claimant presented to her pain management specialist for the first time in several months and reported continued "pain to lower back, radiating down both legs but pain is worse in right leg." (*Id.* at 799–800.) She described her "back pain as aching[,] throbbing[,] and stabbing and sometimes burning and leg pain as tingling and burning." (*Id.* at 800.) She stated that her medications provided "30-40% relief" and requested injections because her "previous injections were helpful for pain relief." (*Id.*) Upon physical examination, the pain management specialist observed normal gait and stance, slightly decreased muscle strength in her left lower extremity but intact reflexes, and tenderness to palpation and limited range of motion in her spine. (*Id.*) She noted that Claimant "failed" physical therapy and recommended bilateral nerve

blocks of her L4, L5, and S1 vertebrae. (*Id.*) She also instructed Claimant to continue using her over-the-counter medications, heat, and ice. (*Id.*)

At her next appointment with her primary care provider on December 12, 2018, the physician's assistant observed decreased range of motion and tenderness on palpation in Claimant's lumbosacral spine upon physical examination. (*Id.* at 746–47.) He refilled Claimant's muscle relaxer and ibuprofen prescriptions. (*Id.* at 747.) She had a lumbosacral nerve block procedure on December 19, 2018. (*Id.* at 834–35.) Two days later, on December 21, 2018, Claimant was involved in an automobile accident. (*Id.* at 863.) She complained of low back pain, which she rated a seven, and requested transport to the hospital for further examination. (*Id.*) At the emergency room, she rated her pain an eight. (*Id.* at 866.) Upon physical examination, the attending physician observed full muscle strength, intact sensory modalities, and normal gait, but Claimant had moderate pain and muscle tenderness in her lumbar spine, and a straight-leg raising test elicited pain "at 30 degrees." (*Id.* at 868.) Imaging of her lumbar spine revealed "[n]o acute fracture." (*Id.* at 872.) Claimant was diagnosed with "Lumbago with sciatica, left side." (*Id.* at 870.) She was given pain injections and reported that her pain decreased, so she was discharged several hours later in stable condition. (*Id.* at 866–67, 870.)

Claimant had another nerve block procedure on January 9, 2019. (*Id.* at 881–82.) When she presented to her pain management specialist several weeks later, on January 24, 2019, she reported that the procedure provided "pain relief at 100% for 2-3 days," but the pain then returned to its previous level. (*Id.* at 885.) She rated her pain "6/10" on the day of her appointment. (*Id.* at 885.) She again requested pain injections and stated that the nerve block procedure was "effective but just didnt [sic] last long enough." (*Id.*) Upon physical examination, the pain management specialist observed slightly decreased muscle

strength in Claimant's left lower extremity, tenderness to palpation in her "Low lumbar spine," and limited spinal range of motion. (*Id.*) She recommended lumbosacral radiofrequency ablation and physical therapy. (*Id.*)

Claimant returned to her pain management specialist on April 4, 2019, complaining of "throbbing" pain in her lower back, which she rated a seven that day. (*Id.* at 106.) She reported that "she got approx[imately] 60% relief" with the nerve block she had in December and related "that she was able to do her [activities of daily living]" and "be more active during that time." (*Id.*) She also reported that her previous radiofrequency ablation procedure provided "60-70% relief" for "6-8 months" and that she "was more functional after the procedure." (*Id.*) Upon physical examination, the nurse practitioner observed tenderness to palpation in Claimant's "Low lumbar spine" and limited spinal range of motion. (*Id.*) She recommended another radiofrequency ablation procedure. (*Id.* at 1069.)

    2. *Consultative Internal Medicine Examination: Dr. Deidre Parsley, D.O.*

On March 28, 2018, Claimant underwent a consultative internal medicine examination with family medicine specialist Dr. Deidre Parsley, D.O. (*Id.* at 386–93.) Claimant told the consultative examiner that her lumbar spine and sacrum pain began "in 2014 when she lifted a patient and hurt her back." (*Id.* at 386.) She related that she was in "constant" pain that "may be sharp or stabbing" and "radiates down the right leg to the foot" and caused "numbness and tingling of the posterior right thigh." (*Id.*) She rated her pain as "5 to 9/10" and stated that it "is aggravated by prolonged sitting or standing" and "is eased by using a heating pad." (*Id.*)

Upon physical examination, the consultative examiner observed that Claimant "ambulates with a slow antalgic gait that is not unsteady," did not use a handheld assistive

device, and "did not have difficulty going from sitting to standing or getting on and off the examination table." (*Id.* at 388.) She further observed that Claimant "appears stable at station and comfortable in the sitting position, but reports low back pain in the supine position." (*Id.*) Claimant was "able to take a few steps on the heels" and "walk on the toes" and "perform tandem gait without difficulty, but [she could] complete only three fourths of a squat reporting low back pain with squatting." (*Id.* at 391.) When examining Claimant's lower extremities, the consultative examiner observed "no tenderness, redness, warmth, swelling, fluid, laxity or crepitus of the knees, ankles or feet" and "no calf tenderness, redness, warmth, cord sign or Homan's sign." (*Id.* at 389.) Her knee extension "is to 0 degrees and flexion is to 150 degrees bilaterally," and her ankle plantar flexion "is to 40 degrees and dorsiflexion is to 20 degrees bilaterally." (*Id.*) She had slightly decreased muscle strength in her right lower extremity but normal reflexes, and her "Sensory modalities are well preserved including light touch, pinprick and vibration." (*Id.* at 391.) When examining Claimant's dorsolumbar spine, the consultative examiner observed normal curvature and "no evidence of paravertebral muscle spasm" but "tenderness to palpation of the lumbar spinous processes in the paralumbar musculature on the right." (*Id.* at 389.) A straight-leg raising test was positive on the right in the supine and sitting positions. (*Id.*) Claimant was "able to stand on one leg at a time without difficulty" and "bend forward at the waist to 85 degrees" and bend laterally "to 30 degrees bilaterally." (*Id.* at 389, 391.) The consultative examiner observed "no hip joint tenderness, redness, warmth, swelling, or crepitus," and Claimant's "Range of flexion of the hips with the knees flexed is to 100 degrees bilaterally." (*Id.* at 391.)

The consultative examiner ordered imaging of Claimant's lumbar spine, which revealed "Mild multifocal lumbar degenerative disc and facet disease from L3-4 through

L5-S1 levels." (*Id.* at 392.) As relevant to this case, the consultative examiner diagnosed Claimant with "Chronic lumbalgia," "Lumbar radiculopathy," and "Lumbar degenerative disc disease and mild scoliosis per CT scan." (*Id.* at 391.)

### 3. *Opinion Evidence: Medical Expert Hearing Testimony*

During the administrative hearing, the ALJ heard testimony from a medical expert about Claimant's physical impairments. (*Id.* at 101–02.) The ALJ first confirmed that the medical expert had not previously discussed his testimony with Claimant, her representative, or the ALJ. (*Id.* at 101.) He then asked the medical expert if he had "reviewed the file regarding physical medical concerns [Claimant] may have," and the medical expert responded in the affirmative. (*Id.*) When asked to "share [his] analysis and state an opinion," the medical expert focused on Claimant's "lumbosacral spinal" impairment. (*Id.*) He noted that magnetic resonance imaging "show[ed] disk bulging . . . and some mild to moderate foraminal stenosis perhaps" and "[s]ome facet arthropathy as well." (*Id.*) He stated, "Once again my contention always is that merely [magnetic resonance imaging] findings are not the basis. They're congruent with physical findings." (*Id.*) The medical expert then pointed to evidence "of decreased motor and sensory issues . . . of lower extremity" and "the issue of straight leg raising positive at 40 degrees, which in most literature 40 degrees is significant." (*Id.*) He continued, "So if we look at the Listing 1.04A . . . with some motor and sensory deficit that was indeed found on physical exam . . . as well as the issue of straight leg raising positivity on the right side, I believe we would equal 1.04A . . . based on injections, based on some failure of therapy, whether indeed surgery will be performed is certainly in the domain of the surgeon that will possibly see this Claimant." (*Id.* at 102.) Neither the ALJ nor Claimant's representative asked the medical expert any further questions. (*Id.*)

12

C.  *Sequential Evaluation Process*

An individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months" is considered to be disabled and thus eligible for benefits.  42 U.S.C. § 423(d)(1)(A).  The Social Security Administration has established a five-step sequential evaluation process to aid in this determination.    20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017).  The ALJ proceeds through each step until making a finding of either "disabled" or "not disabled"; if no finding is made, the analysis advances to the next step.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  "The ultimate burden to prove disability lies on the claimant."  *Preston v. Heckler*, 769 F.2d 988, 990 n.* (4th Cir. 1985); *see Bird v. Comm'r of Soc. Sec.*, 699 F.3d 337, 340 (4th Cir. 2012) ("To establish eligibility for . . . benefits, a claimant must show that he became disabled before his [date last insured].").

At the first step in the sequential evaluation process, the ALJ determines whether the claimant is engaged in "substantial gainful activity."  20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  If the claimant is not engaged in substantial gainful activity, the ALJ moves on to the second step.

At the second step, the ALJ considers the combined severity of the claimant's medically determinable physical and mental impairments.  *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  The ALJ gleans this information from the available medical evidence. *See Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001).  An individual impairment or combination of impairments that is not classified as "severe" and does not satisfy the durational requirements will result in a finding of "not disabled."    20 C.F.R.

§§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015).

Similarly, at the third step, the ALJ determines whether the claimant's impairment or combination of impairments meets or is medically equal to the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "A claimant is entitled to a conclusive presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.'" *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's residual functional capacity" ("RFC") before proceeding to the fourth step. *Mascio*, 780 F.3d at 635; *see* 20 C.F.R. §§ 404.1520(e), 416.920(e). The claimant's RFC reflects "her ability to perform work despite her limitations." *Patterson v. Comm'r of Soc. Sec.*, 846 F.3d 656, 659 (4th Cir. 2017); *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (defining claimant's RFC as "the most the claimant can still do despite physical and mental limitations that affect his ability to work" (alterations and internal quotation marks omitted)); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ "first identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis," then "define[s] the claimant's RFC in terms of the exertional levels of work." *Lewis*, 858 F.3d at 862. "In determining a claimant's RFC, the ALJ must consider all of the claimant's medically determinable impairments . . . including those not labeled severe" as well as "all the claimant's symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other

14

evidence." *Monroe*, 826 F.3d at 179 (alterations and internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a), 416.945(a).

When the claimant alleges a mental impairment, the first three steps of the sequential evaluation process and the RFC assessment are conducted using a "special technique" to "evaluate the severity of [the] mental impairment[]."    20 C.F.R. §§ 404.1520a(a), 416.920a(a); *see Patterson*, 846 F.3d at 659.  Considering the claimant's "pertinent symptoms, signs, and laboratory findings," the ALJ determines whether the claimant has "a medically determinable mental impairment(s)" and "rate[s] the degree of functional limitation resulting from the impairment(s)" according to certain criteria.  20 C.F.R. §§ 404.1520a(b), 416.920a(b); *see id*. §§ 404.1520a(c), 416.920a(c).  "Next, the ALJ must determine if the mental impairment is severe, and if so, whether it qualifies as a listed impairment."  *Patterson*, 846 F.3d at 659; *see* 20 C.F.R. §§ 404.1520a(d), 416.920a(d).  "If the mental impairment is severe but is not a listed impairment, the ALJ must assess the claimant's RFC in light of how the impairment constrains the claimant's work abilities."  *Patterson*, 846 F.3d at 659.

After assessing the claimant's RFC, the ALJ at the fourth step determines whether the claimant has the RFC to perform the requirements of her past relevant work.  20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Monroe*, 826 F.3d at 180.  If she does not, then "the ALJ proceeds to step five."  *Lewis*, 858 F.3d at 862.

The fifth and final step requires the ALJ to consider the claimant's RFC, age, education, and work experience in order to determine whether she can make an adjustment to other work.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  At this point, "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in

15

the national economy.'" *Lewis*, 858 F.3d at 862 (quoting *Mascio*, 780 F.3d at 635). "The Commissioner typically offers this evidence through the testimony of a vocational expert responding to a hypothetical that incorporates the claimant's limitations." *Id.* (quoting *Mascio*, 780 F.3d at 635). If the claimant can perform other work, the ALJ will find her "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If she cannot perform other work, the ALJ will find her "disabled." *Id.*

Applying the sequential evaluation process in this case, the ALJ concluded that Claimant satisfied the insured status requirements and was insured through the date of the decision. (Tr. at 79.) He further determined that Claimant had not engaged in substantial gainful activity since the alleged onset of her disability. (*Id.*) He found that Claimant's degenerative disc disease of the lumbar spine and bilateral carpal tunnel syndrome constituted "severe" impairments. (*Id.*) However, he found that those impairments, or a combination thereof, failed to meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.* at 80–81.) Upon assessing Claimant's RFC, the ALJ determined that Claimant is able "to perform light work . . . except she can lift, carry, push and/or pull 20 pounds occasionally and 10 pounds frequently," "can sit for six hours in an eight-hour workday," "can stand and/or walk for six hours in an eight-hour workday," and "will be alternating to sitting from standing or walking for two to three minutes every hour" but "will remain on task during position changes." (*Id.* at 81.) He further found that she can frequently operate hand controls, handle, finger, and feel, occasionally operate foot controls, stoop, kneel, crouch, crawl, climb stairs, and balance, but never climb ladders, "work at heights" or "in proximity to moving mechanical parts (dangerous machinery)," or operate a motor vehicle. (*Id.*) He determined that she can tolerate "occasional exposure to humidity, wetness, and fumes"

16

but "must avoid temperature extremes and vibration." (*Id.*)  Lastly, the ALJ found that Claimant "will be off task ten percent of a typical workday in addition to normal breaks." (*Id.*)

The ALJ concluded that given the limitations imposed by the Claimant's RFC, she was unable to perform her past relevant work. (*Id.* at 85.)  He noted that Claimant is "closely approaching advanced age" with "a limited education" and that "[t]ransferability of job skills [was] not material to the determination of disability." (*Id.*)  Because the ALJ determined that Claimant was unable to perform the full range of light work, he enlisted a VE to aid in his finding that Claimant is capable of working as a companion, blood bank unit assistant, or clerical assistant. (*Id.* at 85–87.)  As a result, the ALJ concluded that Claimant was not "under a disability . . . from July 26, 2016, through the date of this decision." (*Id.* at 87.)

## II.    *LEGAL STANDARD*

This Court has a narrow role in reviewing the Commissioner's final decision to deny benefits: it "must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct legal standard." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam)).  "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be "more than a mere scintilla." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). In other words, this Court "looks to [the] administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Id.* (alteration omitted).  "[T]he threshold for such evidentiary sufficiency is not high." *Id.* "In reviewing for substantial evidence, [this Court] do[es] not undertake to reweigh

conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Johnson*, 434 F.3d at 653 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)).  Even if "reasonable minds [could] differ as to whether a claimant is disabled," this Court upholds the ALJ's decision if it is supported by substantial evidence.  *Id.* (quoting *Craig*, 76 F.3d at 589).

### III.    ANALYSIS

Claimant argues that the ALJ erred by determining that her spinal condition does not satisfy Listing 1.04A.  (ECF No. 14 at 4–6.)  She asks this Court to reverse the Commissioner's decision and award her benefits or to reverse the Commissioner's decision and remand this matter to the ALJ.  (*Id.* at 6.)  The Commissioner responds that the medical evidence of record fails to establish the requirements of one or more of Listing 1.04A's criteria.  (ECF No. 15 at 9–13.)

At the third step of the sequential evaluation process, the ALJ must evaluate whether any of the claimant's impairments or a combination thereof satisfies or is the medical equivalent of a listed physical or mental impairment.  *Radford v. Colvin*, 734 F.3d 288, 290–91 (4th Cir. 2013) (citing *Hancock v. Astrue*, 667 F.3d 470, 472–73 (4th Cir. 2012).  The claimant bears the burden to demonstrate that his condition meets a Listing. *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (citing *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015)).  The Listings, "if met, are conclusive on the issue of disability."  *Radford*, 734 F.3d at 291 (quoting *McNunis v. Califano*, 605 F.2d 743, 744 (4th Cir. 1979)).

Listing 1.04 addresses "Disorders of the spine . . . resulting in compromise of a nerve root . . . or the spinal cord."  20 C.F.R. pt. 404, subpt. P, app. 1, § 1.04.  Listing 1.04A is met when there is "Evidence of nerve root compression characterized by neuro-

anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." *Id.* § 1.04A.  The ALJ in this case found that none of these criteria were present. (Tr. at 80.)  He explained that imaging "showed only mild degenerative disc disease and scoliosis" and "showed disc bulges at L3-4 and L45 [sic] and some mild foraminal narrowing, but no focal disc herniation and no central canal stenosis" and "no significant nerve root compression or spinal cord compromise" or "spinal arachnoiditis." (*Id.*)  He also observed that Claimant's "sensation was documented as normal" and her "muscle strength was most often identified as full." (*Id.*)  The ALJ remarked that straight-leg raising tests were "at times positive with pain" and noted that "[o]nly one examiner . . . recorded completion of straight-leg raising testing in both supine and sitting positions." (*Id.* at 80 & n.1.)  He also observed that Claimant's "condition did not generally affect her ambulation": "while at times" her "gait was noted to be somewhat antalgic and limping . . . more often, it was observed to be normal and unremarkable." (*Id.* at 80.)  In his review of the medical evidence of record later in his written decision, the ALJ further elaborated on the findings he cited when addressing Listing 1.04A.  (*Id.* at 82.)

He also rejected the opinion of the medical expert who testified at the administrative hearing that Claimant's spinal "condition rises to equal listing 1.04(A)'s criteria." (*Id.* at 84.)  Specifically, the ALJ gave his opinion "no weight" because his "findings are inconsistent with the totality of the objective documentation, possibly because of overfocus on subjective complaints." (*Id.*)  He continued, "While the objective medical information before me certainly does support that claimant's physical impairments would significantly limit her physical work-related abilities . . . that data

does not establish severity which meets the Social Security standard for disability, whether by equaling listing level or other means." (*Id.*) He then repeated his reasoning for concluding that Claimant's spinal condition did not satisfy Listing 1.04A. (*Id.*)

The undersigned **FINDS** that the ALJ correctly determined that the medical findings necessary to meet all of the Listing 1.04A criteria to the letter are not present in the record. Indeed, the medical expert on whose testimony Claimant strongly relies to support her argument seems to have agreed with the ALJ on that point, as the ALJ stated. (Tr. at 84; *see id.* at 101–02.) The medical expert instead opined that Claimant's spinal condition is the medical equivalent of Listing 1.04A. (*Id.* at 102.) When a claimant "ha[s] an impairment that is described in the Listing of Impairments" but "do[es] not exhibit one or more of the findings specified in the particular listing" or "exhibit[s] all of the findings, but one or more of the findings is not as severe as specified in the particular listing," her impairment is nonetheless considered "medically equivalent to that listing if [she] has other findings related to [her] impairment that are at least of equal medical significance to the required criteria." 20 C.F.R. §§ 404.1526(b)(1), 416.926(b)(1).

Although medical expert testimony may provide the evidentiary support necessary for an ALJ to determine that a claimant's impairment is the medical equivalent of a listed impairment, the ALJ cannot merely accept the medical expert's testimony at face value and must instead evaluate it as he would other opinion evidence. SSR 17-2p, 2017 WL 3928206, at *3–*4 (Mar. 27, 2017). That is, the ALJ must assess the persuasiveness of the medical expert's opinions by considering, first and foremost, their supportability and consistency, in addition to the medical expert's relationship with the claimant and specialization and other factors such as the medical expert's "familiarity with the other evidence in the claim or an understanding of [the] disability program's policies and

evidentiary requirements." 20 C.F.R. §§ 404.1520c(c), 416.920c(c).  As the undersigned previously described herein, the ALJ in this case complied with these requirements, ultimately disagreeing with the medical expert's opinion that Claimant's spinal condition is medically equal to Listing 1.04A and adequately explaining his reasons for doing so. (Tr. at 84.)  Medical equivalence at step three is an administrative finding reserved to the ALJ.  SSR 17-2p, 2017 WL 3928206, at *3 (Mar. 27, 2017).  He was entitled to weigh the medical expert's opinion against the other evidence in the record, including the opinions of the state-agency consultants, and reject it, as long as he sufficiently stated his reasoning.  The undersigned **FINDS** that he properly did so in this case.

### IV.    CONCLUSION

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 14), **GRANT** the Commissioner's request to affirm his decision (ECF No. 15), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED** and a copy will be submitted to the Honorable Joseph R. Goodwin, United States District Judge.  Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection.  Extension of this time period may be granted for good cause shown.  Copies of any objections shall be served on opposing parties and provided to Judge Goodwin.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals.  28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

ENTER: June 11, 2021

Dwane L. Tinsley
United States Magistrate Judge